JOHN S. BATTENFELD, SBN 119513
email: jbattenfeld@morganlewis.com
ALEXANDER CHEMERS, SBN 263726
email: achemers@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel. 213.612.2500
Fax: 213.612.2501

MORGAN, LEWIS & BOCKIUS LLP
JENNIFER WHITE-SPERLING, SBN 166504
email: jwhite-sperling@morganlewis.com
JOHN D. HAYASHI, SBN 211077
email: jhayashi@morganlewis.com
5 Park Plaza, Suite 1750
Irvine, CA 92614
Tel: 949.399.7000
Fax: 949.399.7001

MORGAN, LEWIS & BOCKIUS LLP
STEPHANIE A. BLAIR, admitted *pro hac vice*
email: sblair@morganlewis.com
1701 Market Street
Philadelphia, PA 19103-2921
Tel: 215.963.5000
Fax: 215.963.5001

Attorneys for Defendant
LOCKHEED MARTIN CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS RIX, an individual, on behalf of himself, and on behalf of all persons similarly situated,<br><br>            Plaintiff,<br><br>      vs.<br><br>LOCKHEED MARTIN CORPORATION, a Maryland Corporation, and Does 1 to 10,<br><br>            Defendants. | Case No. 09-cv-2063-MMA-NLS<br><br>**OPPOSITION OF DEFENDANT LOCKHEED MARTIN CORPORATION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Assigned To:<br>The Honorable Michael M. Anello<br><br>Date:      February 7, 2011<br>Time:     2:30 p.m.<br>Room:   5 (3rd Floor) |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/22091042.7

Case No. 09-cv-2063-MMA-NLS

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................... 1

II.  FACTUAL BACKGROUND ...................................................................................... 1

    A.  Lockheed Martin ................................................................................................ 1

    B.  The Evidence Shows That ISR Duties Are Far From Uniform ............................. 2

    C.  The Work Experience of Rix Demonstrates The Variability In Duties
        Performed By Of A Particular ISR ...................................................................... 6

III.  THE REQUIREMENTS FOR CLASS CERTIFICATION ARE DEMANDING ............ 8

IV.  RIX'S CLAIMS ARE NOT TYPICAL AND HE IS NOT AN ADEQUATE
    CLASS REPRESENTATIVE ...................................................................................... 9

V.  RIX CANNOT MEET THE PREDOMINANCE REQUIREMENT OF RULE
    23(B)(3) .................................................................................................................... 9

    A.  A Misclassification Class Should Not Be Certified If the Claims Require A
        Fact-Intensive, Individual Analysis Of Each Employee's Exempt Status ............. 9

    B.  Individual Issues Would Predominate In The Determination Of An ISR's
        Exempt Status Under The Administrative Exemption ......................................... 10

        1.  The Broad Functions Rix Alleges Are Not Susceptible To Common
            Proof ....................................................................................................... 11

            a.  Rix's "Primary Task" Assertion Is Not Supported By His
                Own Evidence .............................................................................. 11

            b.  Rix's Reliance On An Alleged Common Function Does Not
                Demonstrate That ISRs Perform The Same Duties....................... 13

            c.  Reliance On Arguments Concerning "Public Safety
                Officers" And "Investigators" Is Not Supported By The
                Evidence Or The Law ................................................................... 15

    C.  Rix Fails to Address The Relevant Predominance Factors Under Ninth
        Circuit Law ...................................................................................................... 19

        1.  Rix's Alleged Common Evidence Does Not Eliminate Any Of The
            Individual Inquiries ................................................................................. 20

        2.  Rix's Certification Authority Is Either No Longer Good Law Or
            Readily Distinguishable ........................................................................... 23

    D.  Individual Issues Predominate As To Rix's Meal and Rest Break Claims........... 24

VI.  RIX FAILS TO ESTABLISH THAT A CLASS ACTION IS THE SUPERIOR
    METHOD FOR ADJUDICATING THE CLAIMS ...................................................... 24

VII.  CONCLUSION ........................................................................................................ 26

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Adam v. United States*
   26 Cl. Ct. 782 (Cl. Ct. 1992) ............................................................................. 16

5

*Adams v. United States*
   78 Fed. Cl. 536 (Fed. Cl. 2007), ....................................................................... 16

6

*Alba v. Papa John's USA, Inc.*
   2007 WL 953849 (C.D. Cal. 2007) .................................................................. 23

7

8

*Andrade v. Aerotek, Inc.,*
   2009 WL 2757099 (D. Md. Aug. 26, 2009) ..................................................... 14

9

10

*Arenas v. El Torito Rests., Inc.*
   183 Cal.App.4th 723 (2010) ............................................................................. 19

11

*Blackwell v. SkyWest Airlines, Inc.*
   245 F.R.D. 453 (S.D. Cal. 2007) ...................................................................... 24

12

13

*Bothell v. Phase Metrics, Inc.,*
   299 F.3d 1120 (9th Cir. 2002) 2010 ................................................................ 16

14

15

*Brady v. Deloitte and Touche LLP*
   2010 WL 1200045 (N.D.Cal March 23, 2010) ................................................ 23

16

*Brown v. Federal Express Corp.*
   2008 WL 906517 (C.D. Cal. 2008) .................................................................. 24

17

18

*Campbell v. Pricewaterhousecooper*
   253 F.R.D. 586 (E.D. Cal. 2008) ...................................................................... 24

19

*Copas v. East Bay Municipal Utility Dist.*
   61 F. Supp. 2d 1017 (N.D. Cal. 1999) ............................................................. 17

20

21

*Damassia v. Duane Reade, Inc.*
   250 F.R.D. 152 (S.D.N.Y. 2008) ...................................................................... 11

22

23

*Dilts v. Penske Logistics, LLC*
   267 F.R.D. 625 (S.D. Cal. 2010) .................................................................. 23, 24

24

*Drake v. Morgan Stanley & Co., Inc.*
   2010 WL 4054123 (C.D. Cal. Apr. 30, 2010) ................................................... 9

25

26

*Dukes v. Wal-Mart Stores, Inc.*
   2010 WL 1644259 (9th Cir. 2010) ............................................................... 8, 10

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Dunbar v. Albertson's, Inc.*
 141 Cal.App.4th 1422 (2006) .................................................................. 19

*Dymond v. United States Postal Service*
 670 F.2d 93 (8th Cir 1982).................................................................... 18

*Ferrell v. Gwinnett County Board of Education*
 481 F. Supp. 2d 1338 (N.D. Ga. 2007) ................................................. 18

*Hanlon v. Chrysler Corp.*
 150 F.3d 1011 (9th Cir. 1998)................................................................. 9

*Hanon v. Dataproducts Corp.*
 976 F.2d 497 (9th Cir. 1992)................................................................... 9

*Heffelfinger v. EDS Corp.*
 2008 WL 892989 (C.D. Cal. Jan. 7, 2008) ........................................... 23

*Hernandez v. Chipotle Mexican Grill, Inc.*
 189 Cal. App. 4th 751 (2010) ................................................................ 24

*In re Visa Check/MasterMoney Antitrust Litig.*
 280 F.3d 124 (2d Cir. 2001) .................................................................... 9

*In re Wells Fargo Home Mortgage Overtime Pay Litig.,*
 571 F.3d 953 (9th Cir. 2009)........................................ 1, 9, 19, 20, 22, 23, 25

*Kassover v. Computer Depot, Inc.*
 691 F.Supp. 1205 (D. Minn. 1987) .......................................................... 9

*Keller v. Tuesday Morning, Inc.*
 179 Cal.App.4th 1389 (2009) ........................................................... 14, 19

*Kennedy v. Commonwealth Edison Co.*
 410 F.3d 365 (7th Cir. 2005).................................................................. 21

*Kurihara v. Best Buy,*
 2007 WL 2501698 (N.D. Cal. August 30, 2007) ................................... 24

*Lewis v. Wells Fargo & Co.*
 669 F.Supp.2d 1124 (N.D. Cal. 2009) .................................................... 23

*Louie v. Kaiser Foundation Health Plan, Inc.*
 2008 WL 4473183 (S.D. Cal. October 6, 2008) .................................... 23

*Mendoza v. Home Depot, U.S.A. Inc.*
 2010 WL 424679 (C.D. Cal. Jan. 21, 2010) .......................................... 25

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

()

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Mike v. Safeco Ins. Co.*
223 F.R.D. 50 (D. Conn. 2004) ........................................................................... 20

*Ortega v. J.B. Hunt Transp., Inc.*
258 F.R.D 361 (C.D. Cal. 2009) ......................................................................... 24

*Perez v. Safety Kleen Systems, Inc.*
253 F.R.D. 508 (N.D. Cal. 2008) ....................................................................... 24

*Reich v. State of New York*
3 F.3d 581 (2d Cir. 1993) ................................................................................... 16

*Roney v. United States*
790 F. Supp. 23 (D.D.C. 1992), ......................................................................... 16

*Salazar v. Avis Budget Group, Inc.*
251 F.R.D. 529 (S.D. Cal. 2008) ....................................................................... 24

*Sav-On Drug Stores v. Superior Court*
34 Cal.4th 319 (2004) ....................................................................................... 19

*Statham v. United States*
2002 U.S. Claims LEXIS 264 (Fed. Cl. Sept. 11, 2002) ..................................... 16

*Taylor v. United Parcel Serv.*
__ Cal. App. 4th at __, 2010 WL 4983586 (Dec. 9, 2010) ............................. 14, 21

*Tierno v. Rite Aid Corp.*
2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) .................................................. 23

*Trinh v. JP Morgan Chase & Co.*
2008 WL 1860161 (S.D. Cal. Apr. 22, 2008) .................................................. 20

*Vinole v. Countrywide Home Loans, Inc.*
571 F.3d 935 (9th Cir. 2009) ............................................ 1, 10, 11, 19, 20, 22, 23

*Walsh v. Ikon Office Solutions, Inc*
148 Cal.App.4th 1440 (2007) ...................................................................... 19, 20

*Wang v. Chinese Daily News*
231 F.R.D. 602 (C.D. Cal. 2005) ....................................................................... 23

*Webster v. Public School Employees of Washington*
247 F.3d 910 (9th Cir. 2001) ............................................................................. 16

*Weigele v. FedEx*
2010 WL 1337031 (S.D. Cal. Apr. 1 5, 2010) .................................... 14, 22, 23, 25

*White v. All American Cable & Radio*
656 F.Supp 1168 (D.P.R. 1987) ........................................................................ 17

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

**TABLE OF AUTHORITIES**
(continued)

Page

*Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*
   Case No. C 05-2320 SBA (N.D. Cal. Oct. 2, 2009) ........................................................ 22, 23

*Wong v. HSBC Mortgage*
   2010 WL 3833952 (N.D.Cal. Sept. 29, 2010) ....................................................... 23

*Zinser v. Accufix Research Inst., Inc.*
   253 F.3d 1180 (9th Cir. 2001)........................................................... 8, 25

**Statutes**

29 C.F.R. § 541.203(a) and (b) .......................................................... 10

29 C.F.R. § 541.205(a) ................................................................... 11

29 C.F.R. § 541.205(c) ................................................................... 11

29 C.F.R. § 541.207(a) ................................................................... 14

29 C.F.R. § 541.207(e) ................................................................... 14

29 C.F.R. § 541.3(b)(1) .................................................................. 15

Cal. Labor Code § 515(e) ................................................................ 10

**Other Authorities**

Wage Order 4-2001 ("WO") § 1(B)(2);.................................................... 10

WO § 1(A)(2)(f)........................................................................... 15

WO § 1(B)(2)(f) .......................................................................... 10

WO §(1)(A)(1) ............................................................................ 13

**Rules**

Fed.R.Civ.P. 23(a) ....................................................................... 8

Fed.R.Civ.P. 23(b) ....................................................................... 8

Fed.R.Civ.P. 23(a)(3) .................................................................... 9

Fed.R.Civ.P. 23(a)(4) .................................................................... 9

Fed.R.Civ.P. 23(b)(3)................................................................... 9, 10, 24

Fed.R.Civ.P. 23(b)(3)(D) ................................................................ 24

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

()

I.     **INTRODUCTION**

The evidence in this case – misstated or ignored in Plaintiff Thomas Rix's Motion for Class Certification ("Motion") – establishes that Rix's misclassification and other claims are entirely inappropriate for class adjudication.  Rix's motion fails to address his actual job duties and those of other Industrial Security Representatives and Industrial Security Representative Srs. ("ISRs").  Instead, Rix bases his Motion on a fictional job that neither he nor any other ISR had, in a wrongly merits-based attempt to argue authority involving "public safety officers."  Rix's own evidence does not support his theory that all ISRs are primarily tasked with "investigating, preventing, and detecting breaches of security protocols and procedures."

In addition, Rix cannot establish the relevant factors identified by the Ninth Circuit for certification of misclassification claims.  *See In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953 (9th Cir. 2009) ("*Wells Fargo*"); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009) ("*Vinole*").  Rix has no evidence of comprehensive uniform policies or training detailing the duties of all IRS, and no other common proof that would absolve the court from inquiring into how each ISR spent their working day.

To the contrary, the evidence, including Rix's own deposition testimony, establishes that the duties of the alleged class are far from uniform.  Therefore, individual inquiries would be required to determine each ISR's exempt status.  For these reasons, Rix's motion should be denied.

II.    **FACTUAL BACKGROUND**

A.     **Lockheed Martin**

Lockheed Martin ("LM") is a global company that is principally engaged in the research, design, development, manufacture, integration and sustainment of advanced technology systems, products, and services.  DKT 24 FAC, ¶ 1.  LM's work for various federal defense agencies can involve access to secret and other classified information that must be safeguarded in the interests of national security.

To access classified information, LM must obtain a Facility Clearance Level ("FCL") through the Defense Security Service ("DSS") for the relevant facility.  Ex 7G (Shobert 47:12-

48:7; 91:3-24).[1]  A FCL may be granted at the Secret or Top Secret level.  *Id*.  LM must sign a DD-441 agreement, which obligates it to comply with the security requirements of the National Industrial Security Program Operating Manual ("NISPOM").  *Id.*  Once a facility is cleared, the DSS works with it to ensure the protection of classified information released or created.  *Id.*

The NISPOM has only the minimal guidelines for safeguarding classified material.  *Id.* at 47:12-48:7, 52:4-7.  The NISPOM covers only collateral (unclassified and secret) programs.  *Id.* at 57:10-14.  The Joint Air Force-Army-Navy ("JAFAN") manuals, which superseded the NISPOM Sup., provide guidance for Special Access Programs ("SAPs").  SAPs are highly sensitive programs that have need-to-know and access controls beyond those normally provided for access to confidential, secret, or top secret information.  *Id.* at 50:12-51:24, 55:20-56:13. NISPOM and JAFAN are just the guides that set forth the security criteria, but how that criteria is interpreted and applied depends upon the program and the customer needs.  Ex 7A (Aviles 67:12-19).  These guides do not specify how the classified information is to be safeguarded.  Instead, an ISR prepares a plan based on his/her assessment of the factors, including the customer's needs, and presents that plan to the customer for approval.  *Id*. 68:21-69:25).  Further, each program can be subject to program specific security requirements set forth in the contract between LM and the DOD or the agency, which an ISR must interpret and implement.  *See, e.g.,* Ex 7G (Shobert 78:22-81:1 (each program has different rules and regulations as to how documents are handled) 102:23-104:20 (ISRs take the Security Classification Guide, statement of work, and program specific classification and security directives to generate own procedures)); Ex 7A (Aviles 89:7-92:1 (ISRs provide criteria based on customer goals for program access for non-exempt employees to implement)).

## B.     The Evidence Shows That ISR Duties Are Far From Uniform

Within this contractor/DOD-agency framework, the overall role of an ISR is to ensure the protection of classified information that is entrusted to LM.  However, within that broad function, as discussed below, the duties of the ISRs at issue here are diverse, depending upon each ISR's

---

[1] All references to "Ex" refers to LM Appendix of Evidence.  The references to "Dep. Ex." refer to deposition exhibits, also included in the Appendix of Evidence.

1    specific assignment, the classification, size, type and phase of the program they are supporting,

2    the skills and experience of the ISR, and other factors.

3    An ISR can be assigned to provide matrix or program support.  The matrix support ISRs

4    are not assigned to support a specific program, but rather perform duties that support a myriad of

5    programs.  Ex 7G (Shobert 18:18-19:18).  A matrix support ISR can work in Communications

6    Security, Technical Security (which includes physical security and computer security),

7    Investigations Unit, Government Security (which includes Security Education and Training

8    ("SEAT"), PAR processing, and clearance processes), or Security Services (which includes alarm

9    administration, badge and id, visit control and classified material destruction services).  *Id.* at

10    142:1-143:9; 179:19-189:17, 189:25-192:18; Ex 7A (Aviles 26:13-19), Ex 2 (Barragan Decl. ¶ 3).

11    ISRs assigned to matrix support are often specialists with distinct job duties.  Ex 7G

12    (Shobert 133:2-134:2 (matrixed COMSEC ISRs highly trained by NASA with specialized

13    experience in encryption)); 205:8-20 (matrixed computer security ISR more likely to be paid

14    more because requires certain technical skills).  For example, at Palmdale, one matrix support ISR

15    primarily supervises several hourly locksmiths and the Linnell system operator in the lockshop.

16    Id. 181:17-183:11.  Matrixed ISRs at Palmdale assigned to computer security perform duties such

17    as developing Specialized Security Policies governing computer uploads/downloads, developing

18    guidelines for access to computer equipment, performing threat testing to monitor the security of

19    the network, and testing the computer's firewalls and security programs, preparing threat

20    assessments and vulnerability reports, and making recommendations on how to maintain network

21    security.  Ex 1 (Albin Decl. ¶ 4).  Another matrixed ISR who worked with physical security had

22    duties including designing and planning physical workspaces where engineers can work on

23    classified projects.  Ex 4 (Riggs Decl. ¶¶ 5-7) (worked with subcontractor to design a cost-

24    effective solution to adapt the facility in an older building to meet security protocols to be

25    certified)).  Another matrixed ISR assigned to physical security had different duties, including

26    inspecting classified workspaces to verify their manual compliance with security protocols,

27    supervising contractors who performed the manual work to remedy any potential physical

28    security issues (such as patching holes in walls, repairing conduit lines, fixing malfunctioning

1  locks, planning security alarm coverage for classified workspaces, and preparing security

2  accreditation paperwork.  Ex 2 (Barragan Decl. ¶ 6).  Another matrixed ISR's duties focused on

3  personal security issues, including addressing issues relating to eligibility for a DOD clearance to

4  access a Special Access Required ("SAR") program, and tracking and reporting on employee

5  foreign travel, foreign contact, foreign money, and unexplained wealth.  Ex 7G (Shobert 157:1-

6  159:14).

7  The duties of the ISRs assigned to specific programs also vary depending upon the

8  programs to which they are assigned.  In SAPs, ISRs can be Contractor Program Service Officers

9  ("CPSO"), an assigned, billeted position with the government, for one large program or a series

10  of interconnected programs.  Id. Shobert 100:3-113:11.  At Palmdale, CPSOs are assigned to

11  Advanced Development Programs ("ADP"), commonly known as Skunkworks, with duties such

12  as identifying and setting up the facility, identifying the proper staffing for the program,

13  developing area operating procedures, job instructions and security operations procedures for the

14  program, identifying the need for and requesting deviations or a permanent waiver from JAFAN

15  requirements, having signature authority for all Program Access Requests ("PARs") and official

16  correspondence from the program, creating all TS-move plans for classified hardware assets,

17  creating test plans, having overall responsibility for all courier activity (including formulating

18  detailed courier plans in concert with the TSA and FBI), and being the primary point of contact

19  with the government.  *Id.*  Depending upon the program, the CPSO can also work closely with

20  subcontractors, including assisting the subcontractor to obtain accreditation of its facility and then

21  becoming responsible for the security of that facility.  *Id.* at 163:19-166:6.  Further:

22  [CPSOs] are in a decision-making capability all day long.  And, again, their roles
   change just like every day.  There is absolutely nothing routine about what a
23  CPSO does, with the exception of showing up for work.

24  *Id.* at 107:21-25.

25  Another ISR acts as the sole security site lead for the U-2 program.  His responsibilities

26  include conducting security briefings with the customer, tracking security incidents, providing

27  weekly status updates to program managers, advising the customer on applicable security

28  guidelines, approving PARs, and providing HIRSCH security access for personnel working in the

1   program area.  He serves as both a point of contact and as a supervisor for the Plant Protection

2   Officers in his building, who often come to him with security-related questions.  Ex 5 (Stephens

3   Decl. ¶ 5).

4          Other ISRs support large programs, like the F-117 program that developed the "stealth

5   fighter."  In large programs, ten to fifteen ISRs all with different roles can be assigned to a team.

6   Ex 2 (Barragan Decl. ¶ 4).  For example, an ISR may be assigned to visitor control or Information

7   Management Control ("IMS") functions within a large program.  In addition, an ISR's duties can

8   vary depending upon whether the large program is hardware- or document-centric or an

9   unacknowledged or acknowledged SAP, or collateral program.  *Id.*  For example, each program

10  has its own set of rules and regulations as to how the classified documents are to be handled,

11  transmitted and destroyed.  Since the rules and regulations governing unacknowledged programs

12  cannot be disclosed, what activities an ISR performed cannot even be described.  *See, e.g.,* Ex 7A

13  (Aviles 76:14-77:1).  For a document-centric program, which handles highly classified

14  documents, an ISR's duties may include determining whether documents are properly classified

15  and have the proper classification and declassification and downgrading authority, writing

16  discrepancy reports, cataloguing and tracking documents, controlling the distribution of

17  documents to approved recipients, completing data file transfers and technology transfer requests,

18  creating courier plans, ensuring the proper destruction of documents, including as appropriate

19  preparing TS-move plans which sometimes include armed guards, conducting secure postal runs

20  of classified documents, and other tasks.  *Id.*  In a hardware-centric program, an ISR's expertise is

21  applied to security issues concerning hardware.  Ex 7G (Shobert 70:17-21).  This includes

22  advising program engineers at what point in the conception or building of a part it becomes

23  classified.  *Id.* at 155:8-21

24         The amount and nature of the discretion each ISR exercises also depends on various

25  factors, including their assignments, their level of clearance, the particular job duties they

26  performed, the experience and skills they had, the programs in which they worked, and the

27  managers they had.  For example, Plaintiff claimed that he was closely supervised by two of his

28  managers.  Ex 7C (Rix 239:19-240:19).  In contrast, other ISRs worked with little or no

1   supervision.  Ex 5 (Stephens Decl. ¶ 5 (security site lead for the U-2 program)); Ex 1 (Albin Decl.

2   ¶ 6 (relies on ISRs to take initiative and encourages them to come up with ideas and

3   recommendations)); Ex 3 (Nye Decl. ¶ 4 (expects the four ISRs he supervises at Edwards AFB to

4   work independently and without direct supervision)).  Rix claims that he never developed security

5   programs or procedures for classified materials standard operating procedures ("SOP") or

6   practices and policies ("SPP") (Ex 7C (Rix 82:2-16), but other ISRs have.  Ex 3 (Nye Decl. ¶ 5

7   (ISRs meet with government representatives and analyze, interpret and apply guidelines such as

8   NISPOM and JAFAN to create procedures and protocols specific to the customer's program

9   needs)); Ex 1 (Albin Decl. ¶ 5 (ISRs interpret NISPOM and JAFAN and develop customized

10  procedures and systems that are applicable to the supported programs)).  ISRs also made

11  recommendations as to various issues specific to their role.  Ex 2 (Barragan Decl. ¶ 8

12  (recommended deviation proposal to address storage of classified material in an emergency and a

13  cost-saving recommendation regarding option to provide secure space); Ex 5 (Stephens Decl. ¶ 6

14  (recommended creation of electronic visitor database for use of Plant Protection Officers)).

15      C.      **The Work Experience of Rix Demonstrates The Variability In Duties Performed By Of A Particular ISR**

16          When Rix came to Palmdale in 2004, he was assigned to the U-2 program.[2]  Rix's first

17  supervisor gave him autonomy in completing his assignments.  Ex. 7E (Rix 556:16-557:22).  Rix

18  was not able to discuss all of his U-2 program duties because of classified information, but he

19  wrote a concept of operation for the site, and conducted security briefings and debriefings,

20  including tailored group and one-on-one briefings, where he provided advice about security

21  issues.  *Id.* at 142:11-144:13, 148:24-151:23, 155:12-156:1.

22          In 2005, Rix began working on the F-117 program in Special Missions.  Ex. 7C (Rix 77:7-

23  10).  Unlike the U-2 program, F-117 was a SAP.  *Id.* 80:6-14.  Rix then rotated into different

24  functions in Special Missions.  *Id.* at 179:17-180:8.

25          For nine months in 2006-2007, Rix worked in the Classified Material Services ("CMS" or

26

27  _____

[2] Rix spent six years in the U.S. Army; and described his experience as including: "Tactical and strategic service domestic and abroad.  Experience with various intelligence agencies."  Ex 7C, E, F (Rix 45:6-46:5, 486:8-19, Dep. Ex 31).

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

"document control") area where his primary duties were CMS functions. Rix felt these functions were "mundane and routine." 26.9. *Id.* at 173:3-6, 277:3-11. Before that assignment, he had spent at most 5 minutes a week performing CMS functions. *Id.* at 177:25-178:13.

In April 2007, Rix was transferred to the 227 area, where he performed different duties. *Id.* 308:21-24; 313:19-22. *See* Ex 11 311:25-313:11 (partial list of duties allegedly performed in CMS vs. 227 prepared by Rix). Rix referred to himself as the "lead counterintelligence representative," and he created and delivered a counterintelligence ("CI") briefing, created a 20-25 page program security representative handbook, created a foreign travel book, among other duties. *Id.* at 159:20-25, 191:2-23, 329:10-15, 321:21-322:8, 365:3-366:3. Plaintiff processed only 20 PARs during his entire employment at Palmdale. *Id.* 377:14-24.

In 2008, Rix took on a different function, focusing on the closeout phase of the F-117 program, which involved decertifying areas, creating a presentation on the closeout process for management, analyzing statistics and lessons learned for upcoming program closures, and developing processes to save time in decertifying areas. *Id.* 389:19-21; 392:11-20; 398:18-403:16. Prior to 2008, Rix performed minimal decertification duties. *Id.* 392:21-393:9. During 2008, Rix continued with program security education training and awareness programs and briefings, public release issues, and updating the CI brief; he also created, developed and delivered a weekly update on CI issues, created a national threat book, and created the "CI edge cookbook." *Id.* 419:25-422:8. In 2008 and continuing into 2009, Rix also was involved in recruitment duties. *Id.* 403:21-409:9.

While assigned to Special Missions, Bea Aviles and Mark Muranaga were Rix's supervisors. Rix claimed that Aviles and Muranaga "stand over you watching you every step of the way to see if you were doing it properly or to their satisfaction." *Id.* 556:24-557:12. In 2006, Rix thought that Aviles and Muranaga were spying on him, and claimed Aviles, Muranga, and others were part of "an absolutely corrupt security organization which operates on nepotism." Ex 7C (Rix Dep. Ex 8, 237:1-9, 239:23-240:19, 245:18-247:1).

In 2009, with the closure of the F-117 program, Rix was transferred to the Computer Security department. His supervisor there was Karen Barragan, who Rix stated "was less of a

micro-manager than Aviles.  Ex. 7E (Rix 556:16-557:15; 501:2-18).  Because Rix lacked technical expertise, he was assigned inventory and backup duties.  However, he identified a security flaw and created a system to streamline the inventory process.  Ex. 7E, F (Rix 492:7-494:25, 497:14-21, Dep. Ex. 33, 499:16-501:1).  From July 6, 2009 to his termination in August of 2009, Rix assisted investigators because they were short on personnel; until that time he did not have an investigator job function.  Ex. 7C (Rix 73-74).

Rix had significant performance-related issues, receiving a "Basic Contributor" rating on his annual performance reviews in 2006, 2007, and 2008.  *Id.* 223:23-25; 341:3-12; Ex 15; 382:7-12.  According to Rix, "Basic Contributor" means someone who is "very unknowledgeable, nonperforming, incompetent, [and] 'needs to be held by the hand to do his or her job type[.]'"  *Id.* 223:23-224:21.  Rix was on a performance development plan in 2007 and 2008.  Ex. 7E (Rix 497:19-498:8).  Among other issues, Rix did not have an adequate understanding of complex federal security procedures, including SAP/SAR, and he regularly disappeared during work hours.  Ex. 7C (Rix 220:24-221:19; 295:25-297:6); Ex 7A (Aviles 139:5-25, Dep. Ex. 15).

In 2009, Rix engaged in egregious misconduct and was terminated.  On July 23, 2009, Rix climbed over the security fence at the Palmdale facility – a major violation of security procedures.  At the same time, various females complained of sexual harassment by Rix who made frequent inappropriate remarks.[3]  Following an investigation, Rix was terminated on August 21, 2009.

## III.   THE REQUIREMENTS FOR CLASS CERTIFICATION ARE DEMANDING

Rix bears the heavy burden of establishing that the proposed class meets all the Rule 23(a) requirements and at least one Rule 23(b) requirement.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  The Court must "perform a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied."  *Dukes v. Wal-Mart Stores, Inc.*, 2010 WL 1644259, *16 (9th Cir. 2010), cert. granted, __ U.S. __ (2010).  Rix must actually demonstrate, not just allege, that his suit is appropriate for class resolution.  *Id.* at *13.  "Whether judicial

---

[3]  For example: (1) Rix stated to one female, "Would you give me a blow job?"; (2) at recruiting events, Rix gave female applicants his personal contact information and sent them emails like, "Yoga huh?  You're a hottie and flexible—wow!  When are we going out?  Haha;" (3) Rix told a co-worker, "If I said I'd like to/want to kiss you, you'd be cool with that, right?  You wouldn't make a big deal about it/get me in trouble/turn me in, right?"  Ex 7E, F (Rix 541:16-544:17, Dep. Ex. 41).

1   economy will be served in a particular case turns on close scrutiny of 'the relationship between

2   the common and individual issues.'" *Wells Fargo*, 571 F.3d at 958 (quoting *Hanlon v. Chrysler*

3   *Corp*., 150 F.3d 1011, 1022 (9th Cir. 1998)).

## IV.   RIX'S CLAIMS ARE NOT TYPICAL AND HE IS NOT AN ADEQUATE CLASS REPRESENTATIVE

Rix may sue as a representative party on behalf of a class only if his claims or defenses

are typical of the claims or defenses of that class. Fed.R.Civ.P. 23(a)(3).  Typicality is lacking if

Rix is subject to unique defenses that threaten to become the focus of the litigation.  *Hanon v.*

*Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992).  Rix must also show that he will fairly

and adequately protect the interests of the class.  Fed.R.Civ.P. 23(a)(4).  A plaintiff subject to

unique defenses is an inadequate class representative.  *Kassover v. Computer Depot, Inc*., 691

F.Supp. 1205, 1215 (D. Minn. 1987).  Here, given Rix's substandard performance and

termination for egregious violations of company policies, Rix is subject to unique defenses

demonstrating lack of typicality and inadequacy.  *Drake v. Morgan Stanley & Co., Inc.*, 2010 WL

4054123, *4-5 (C.D. Cal. Apr. 30, 2010) (finding that employee subject to unique defenses

relating to substance abuse and inadequate performance was neither typical nor an adequate

representative).

## V.   RIX CANNOT MEET THE PREDOMINANCE REQUIREMENT OF RULE 23(B)(3)

### A.   A Misclassification Class Should Not Be Certified If the Claims Require A Fact-Intensive, Individual Analysis Of Each Employee's Exempt Status

Rule 23(b)(3) permits a class action only if "the court finds that the questions of law or

fact common to class members predominate over any questions affecting only individual

members . . ."  The predominance inquiry tests whether the class is sufficiently cohesive to

warrant adjudication by "representation."  *Wells Fargo*, 571 F.3d at 957.  "[P]laintiff must

establish that the issues in the class action that are subject to generalized proof, and thus

applicable to the class as a whole . . . predominate over those issues that are subject only to

individualized proof."  *In re Visa Check/MasterMoney Antitrust Litig*., 280 F.3d 124, 136 (2d Cir.

2001).

1   "Rule 23(b)(3) requires a district court to formulate 'some prediction as to how specific

2   issues will play out in order to determine whether common or individual issues predominate in a

3   given case.'" *Dukes*, 2010 WL 1644259 at *16.  For misclassification claims, an assessment of

4   Rule 23(b)(3) "implicates the analytical framework within which courts review application of the

5   exemption to an employee."  *Vinole*, 571 F.3d at 944.  Certification is not appropriate if the court

6   determines that "Plaintiffs' claims require a fact-intensive, individual analysis of each employee's

7   exempt status."  *Id*. at 947.

8        **B.        Individual Issues Would Predominate In The Determination Of An ISR's**
                     **Exempt Status Under The Administrative Exemption**
9
            Under California law, the administrative exemption requires an inquiry into whether:  (1)

10  the employee's duties and responsibilities involve the performance of office or non-manual work

11  directly related to management policies or general business operations of the employer or the

12  employer's customers; *and* (2) the employee customarily and regularly exercises discretion and

13  independent judgment; *and* (3) the employee regularly and directly assists an exempt executive or

14  administrative employee, *or* the employee performs under only general supervision work along

15  specialized or technical lines requiring special training, experience, or knowledge, *or* the

16  employee executes under only general supervision special assignments and tasks; *and* (4) the

17  employee spends more that half the time engaged in duties that meet the test of the exemption, as

18  such terms are construed under the FLSA.  Wage Order 4-2001 ("WO") § 1(B)(2); Cal. Labor

19  Code § 515(e).  Work that meets the test of the exemption includes "all work that is directly and

20  closely related to exempt work and work which is properly viewed as a means for carrying out

21  exempt functions."  WO § 1(B)(2)(f).

22          Under the governing regulations, if an employee performs "office" work "it is immaterial

23  whether it is manual or non-manual in nature."  Even if the employee does not perform office

24  work, the performance "of some manual work will not preclude exempt status, unless "the

25  employee performs so much manual work (other than office work) that he cannot be said to be

26  basically a 'white-collar' employee . . . ."  *See* former 29 C.F.R. § 541.203(a) and (b).[4]

27

28
[4] The California Wage Order expressly incorporates this and other specified federal regulations in effect as of 2001.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

1    The phrase directly related to management policies or general business operations is

2    meant to describe activities of substantial importance to the management or operation of the

3    employer's business or its customers (here the U.S. government).  29 C.F.R. § 541.205(a).  This

4    is not limited to persons who directly participate in the formulation of management policies or in

5    the operation of the business as a whole.  Rather, employees whose "work affects policy or whose

6    responsibility it is to execute or carry it out" are also covered by the administrative exemption.

7    The exemption can also apply to employees whose assignments "are tasks related to the operation

8    of a particular segment of the business, and to "advisory specialists".  29 C.F.R. § 541.205(c).

9                    1.    *The Broad Functions Rix Alleges Are Not Susceptible To Common Proof.*

10    Because there is no evidence that an ISR's job duties "are largely defined by

11    comprehensive corporate policies and procedures[5], Rix attempts to tie ISRs together by claiming

12    that they "all spent their time performing the same primary task of investigating, detecting and

13    preventing violations of security protocols and procedures."[6]  Mtn at 2.  This claimed "same

14    primary task" (which is actually three broad functions) is not supported by the evidence submitted

15    by Rix, bears no resemblance to the ISR job descriptions, and is contradicted by LM's declarants

16    and Rix's own testimony.

17                    a.    Rix's "Primary Task" Assertion Is Not Supported By His Own
                            Evidence

18

19    In three cookie-cutter declarations submitted by Rix, three former ISRs (who ended their

20    employment in January 2006, March 2007 and July 2008) stated that they spent over 50% of their

21    time "(a) receiving, storing, marking, transmitting, and transporting documents; (b)

22    opening/closing/locking doors, and/or safes; and (c) briefing and debriefing [LM] employees

23    about security protocols."  Plfs' Declarants Ellis-Buckner, Weston and Lewis.  Not one declarant

24    claims their primary duty, or any duty, was "detecting and preventing violations of security

25    protocols and procedures."  Only one declarant even mentions investigations, but does not

26    identify it as a primary task.  Plf's Declarants Lewis ¶ 8.  These declarations clearly do not

---

[5] *Vinole*, 517 F.3d at 946 (citing *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008)).

[6] While Plaintiff contends that the "evidence" described in his brief confirms the duties alleged in his FAC (Mtn. 5), the FAC did not allege that the primary duties of ISRs were "investigating, detecting and preventing violations of security."  *See* FAC ¶ 3.

1    support Rix's "primary task" theory.

2         Rix's own deposition testimony also does not support his "primary task" theory.  Rix

3    testified that he did not have an investigator's title or function while employed at Palmdale.[7]  Ex

4    7C (Rix 73:24-74:15.)  Rix did not testify that his primary duty was "detecting and preventing

5    breaches of security protocols and procedures."  Instead, Rix described the wide variety of duties

6    he performed during his employment, that changed over time.  *See,* discussion section II.C.

7    above.[8]

8         Contrary to Rix's contention, the job descriptions do not "show" that ISRs are primarily

9    tasked with "investigating, detecting and preventing breaches of security protocols and

10   procedures."  Mtn 10.  Both job descriptions include the following descriptor:

11        Develops, and administers security programs and procedures for classified
          or propriety materials, documents, and equipment.  Studies and implements
12        federal security regulations that apply to company operations.  Obtains
          rulings, interpretations, and acceptable deviations for compliance with
13        regulations from government agencies.  Prepares manuals outlining
          regulations, and establishes procedures for handling, storing, and keeping
14        records, and for granting personnel and visitors access to restricted records
          and materials.  Conducts security education classes.  Investigates security
15        violations and prepares reports specifying preventive action to be taken.

16   DKT 42-5, Plf.'s Ex 10, p. 180.  "Investigating" is the only "primary task" claimed by Rix that is

17   mentioned in the job descriptions and that function is expansively described as "[i]nvestigates

18   security violations and prepares reports specifying preventative actions to be taken."  The job

19   descriptions also make no mention of the alleged primary duties described by Rix's declarants.

20   The only overlap is arguably conducting security education classes, if that is what the declarants

21   mean by "briefing and debriefing Lockheed employees about security protocols."  Rix *denied* that

22   he performed a number of the duties identified on the job descriptions.  Ex 7C (Rix 82:8-16, 88:6-

23   25, 295:4-13).  Thus, there is no commonality between Rix's "primary duty" theory, the

24

25   [7] Noticeably absent from Plaintiff's motion is a description of the duties he performed as an ISR.  Instead Plaintiff
     cites his conclusory testimony that he performed the same work as all ISRs.  Mtn 9-10.  But Rix admitted that he only

26   observed the work of ISRs in the F-117 and U-2 programs.  Ex 7C, E (Rix 200:10-201:4; 552:9-25 (testifying that he
     did not know what ISR did in COMSEC because he was not briefed to that program)).

27   [8] To the extent that Rix claims that all these different duties constitute "preventing breaches of security protocols and
     procedures," that interpretation would render the "task" so broad that it could encompass any job duty performed by
     an employee working in a classified environment, and would therefore not shed any light on what duties someone

28   actually performed.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

1  declarants' claimed primary tasks, Rix's own testimony about his specific duties, and the duties

2  described in the job descriptions.  Rix's own evidence demonstrates that it would be necessary to

3  conduct an individual inquiry to determine what duties a particular ISR did or did not perform.

4      The source of Rix's "primary task" theory is the so-called "Expert Report" by a plaintiff-

5  side attorney, Miles Locker.  The Locker Report is inadmissible as a matter of law, as explained

6  in LM's concurrently filed Motion to Strike.  Moreover, Locker's legal opinion is completely

7  unreliable because Locker blatantly misstates or ignores evidence and law.  For example, citing

8  Rix's deposition, Locker claims that ISRs did not develop or assist in developing security

9  programs, policies, or procedures.  Locker Report 7.  This ignores substantial deposition

10  testimony to the contrary including testimony by Rix himself.  Ex 7C, E (Rix 291:8-15; 294:4-11,

11  389:19-21; 392:11-20; Ex 7G (Shobert 78:22-81:1; 102:23-104:20).

12              b.     Rix's Reliance On An Alleged Common Function Does Not
                       Demonstrate That ISRs Perform The Same Duties.

13      Even if Rix's evidence supported his contention that ISRs "uniformly perform the same

14  task of investigating, detecting and preventing threats to sensitive and classified information," this

15  vague common function sheds no light on whether any particular ISR's duties qualify for the

16  administrative exemption.  California law mandates that, in determining exempt status, "the work

17  actually performed by the employee during the course of the workweek must, first and foremost,

18  be examined and the amount of time the employee spends on such work . . . shall be considered."

19  WO §(1)(A)(1).  Rix has no evidence of a policy that establishes what tasks an ISR should do

20  each day or how much time should be spent on each task.  Further, despite Rix's attempt to

21  cherry-pick certain specific duties performed by specific ISRs, the evidence establishes that the

22  duties are highly variable not only among ISRs, but as to a particular ISR at particular time.

23  Rix's own job history emphatically demonstrates this point as his duties changed markedly over

24  time.  Rix's cursory duties discussion omits a variety of duties performed by some ISRs,

25  including Rix himself.  For example, Rix fails to include vendor and subcontractor facility

26  security management; developing area and security operating procedures, preparing threat

27  assessments and vulnerability reports; making recommendations on on how to maintain network

28

security; designing and planning physical workspaces; creating all TS-move plans, including coordinating with the TSSA and FBI, being the primary point of contact with the military or government agency, and many other duties an ISR may have performed.

The need for an individualized inquiry to determine exempt status in this case is demonstrated by the applicable regulations.  The phrase "exercise of discretion and independent judgment" is defined as generally involving

> the comparison and evaluation of possible courses of conduct and acting while making a decision after the various possibilities have been considered.  The term … implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision, and with respect to matters of significance.

29 C.F.R. § 541.207(a).  "The requirement that discretion be exercised with respect to 'matters of significance' means the decision being made must be relevant to something consequential and not merely trivial." *Taylor v. United Parcel Serv.*, __ Cal. App. 4th at __, 2010 WL 4983586, *16 (Dec. 9, 2010).  Further, "decisions made as a result of the exercise discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *See* 29 C.F.R. § 541.207(e).  Given these standards, courts have held that reliance on broad functions or overall policies is not a sufficient basis to certify a misclassification class.  *See Andrade v. Aerotek, Inc.*, 2009 WL 2757099 (D. Md. Aug. 26, 2009) (certification under FLSA rejected where plaintiffs relied on similar overall functions of recruiters but there was "a wide variety … from recruiter to recruiter, in the specific functions they perform and the degree of frequency with which they perform them").[9]  Here, Rix's alleged common functions shed no light on what duties an ISR actually performed, how he was supervised, or the significance of any decisions or recommendations made.

        c.      <u>Reliance On Arguments Concerning "Public Safety Officers" And "Investigators" Is Not Supported By The Evidence Or The Law.</u>

Rix asserts that a class of ISRs should be certified because he contends that ISRs are

---

[9] *See also Weigele v. Fedex Ground Package Sys., Inc.*, 2010 WL 1337031 (S.D. Cal. Apr. 15, 2010) (class decertified because even though there were "standard work processes for tasks," the "common processes are similar, speaking to the small details of particular tasks but not how managers were to balance their responsibilities"); *Keller v Tuesday Morning, Inc.* 179 Cal. App. 4th 1389, 1396 (2009) (class decertified where court "observed that the question of mandated management policies was subject to class-wide proof, yet the amount of time a manager spent performing these acts and his or her exercise of discretion are matters of individual inquiry").

1  "public safety employees" as described in 29 C.F.R. § 541.3(b)(1) and that all work performed by

2  ISRs is nonexempt work based on this regulation and DOL Letter FLSA 2005-21.  Mtn. 6, 7.  But

3  Section 541.3(b)(1) and the DOL letter do not apply.  First, 541.3(b)(1) did not exist in 2001, and

4  is not incorporated into the relevant California regulation.  *See* WO § 1(A)(2)(f).  In any event,

5  541.3(b)(1) applies to specified public safety positions, which are expressly listed in the

6  regulation.  ISRs are private employees who do not have any of the job titles or duties listed in the

7  regulation.[10]

8        Likewise, the DOL Letter is inapplicable.  The employees at issue were investigators who

9  worked for a company that contracted with the DSS solely to provide background investigations

10  to DSS of potential government employees considered for secret and top secret security

11  clearances.  Further, the activities performed by these investigators were "more related to

12  providing the ongoing, day-to-day investigative services, rather than performing administrative

13  functions directly related to managing" the business, because "the primary duty of the

14  Investigator is diligent and accurate fact-finding, according DSS guidelines, the results of which

15  are turned over to DSS who then makes a decision as to whether to grant or deny security

16  clearances."  There is no evidence that this was the primary duty of Rix, or any ISR, much less all

17  of them.  For the same reason, the DOL's view that DSS investigators did not exercise discretion

18  and independent judgment is irrelevant to this case.

19        To the extent Rix is attempting to argue that ISRs are "production" workers who

20  "produce" investigations, there is no evidence that this is any ISR's primary duty.  Rix himself

21  conceded that he only performed investigations during the last two months of his employment.  In

22  any event, as Rix's own complaint alleges, LM's business is not producing investigations; it is

23  "principally engaged in the research, design, development, manufacture, integration and

24

25  ───────────────

[10] Among other things, ISRs do not carry guns, do not engage in providing personal security, do not conduct

26  surveillance and stakeouts, do not pursue and restrain suspects, and are not first-responders to security incidents.  Ex.
   1C Albin Decl. ¶ 4); Ex 4 (Riggs Decl. ¶ 4).  The plant protection officers (who are classified as non-exempt)

27  perform the day to day work of physically protecting the Palmdale facility, by working at the guard gate, patrolling
   the facility, responding to alarms, and escorting visitors around the site.  Ex. 4 (Riggs Decl. ¶ 4).  Indeed, some ISRs

28  supervise plant protection officers.  Ex 5 (Stephens Decl. ¶ 5).

1  sustainment of advanced technology systems, products and services."  FAC ¶ 1.[11]

2  　　　Rix's improper merits argument also cites *Roney v. United States*, 790 F. Supp. 23

3  (D.D.C. 1992), *Statham v. United States*, 2002 U.S. Claims LEXIS 264 (Fed. Cl. Sept. 11, 2002),

4  *Adams v. United States*, 78 Fed. Cl. 536 (Fed. Cl. 2007), and *Adam v. United States*, 26 Cl. Ct.

5  782 (Cl. Ct. 1992), to argue that an ISR's work "amounts to nothing more than the use of skill in

6  applying well-established techniques, procedures or specific standards described in manuals or

7  other sources."  As with the other authority cited by Rix, the jobs at issue in these cases have no

8  similarity to the ISR position.  In addition, these cases do not discuss the standard of "the use of

9  skill in applying well-established techniques, procedures or specific standards," but rather address

10  whether the employee provided administrative services to the employer.  In *Roney*, the Deputy

11  U.S. Marshall did not work in an office, handled potentially dangerous and physically stressful

12  situations, performed significant manual work, and did not give advice.  790 F. Supp. at 27.  In

13  *Statham*, the physical security specialist spent between 70 and 99 percent of his work time

14  performing physical executive protection for the Secretary of Energy.  Other duties, such as

15  identifying threats, planning advance travel work and making recommendations based on advance

16  work, were a small part of his time.  2002 U.S. Claims LEXIS at 264.  In *Adams,* the HUD

17  investigators spent most of their time investigating or leading investigations into crimes of fraud

18  upon HUD programs, "typical law enforcement duties".  In *Adam,* the senior border patrol agents

19  were uniformed and armed and engaged in routine law enforcement duties concerning

20  compliance with immigration laws.  26 Cl.Ct. at 785.

21  　　　In contrast to Rix's improper merits-based arguments involving clearly inapposite

22  positions, the cases that involve analogous positions demonstrate that where employees involved

23  with security-related duties are serving in an advisory capacity and exercising discretion and

---

24  [11]  *Reich v. State of New York*, 3 F.3d 581 (2d Cir. 1993) is also inapposite.  In *Reich*, the court also applied the

25  administration/production dichotomy in holding that because "the primary function of the Investigators [for the Bureau of Criminal Investigations] . . . is to conduct – or 'produce' -- its criminal investigations," the very service

26  performed by the Bureau, the Investigators fell "squarely on the 'production' side of the line."  In any event, the Ninth Circuit rejected the use of the administration/production dichotomy as a determinative test in *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir. 2002).  *See also Webster v. Public School Employees of Washington*, 247 F.3d

27  910 (9th Cir. 2001) ("the purpose of the dichotomy is to clarify the meaning of 'work directly related to the management policies or general business operations,' not to frustrate the purpose and spirit of the entire exemption.").

28

independent judgment with respect to security issues, they can qualify for the administrative exemption.  To determine these issues here would require an individualized inquiry as to each ISR.  In *White v. All American Cable & Radio*, 656 F.Supp 1168 (D.P.R. 1987), the court held that a manager for security and safety was an exempt administrative employee.  Among other duties, the employee organized and conducted security training sessions, oversaw the company's security procedures and programs, and advised and made recommendations to his employer on security matters.  The employee was not directly involved in the formulation of management policies, but the court found that the administrative exemption was not limited "to persons who directly participate in the formation of management policies or the business operations," but also covered "persons who serve in an advisory capacity to management ..."  *Id.* at 1170.  The court held that although "many of plaintiff's responsibilities required him to be outside the office, making security inspections or performing other field work, his job was clearly non-manual in nature."  *Id.*  The court also concluded that the employee's functions

> were of substantial importance to the management and operation of defendant's business.  In defendant's business of communications, the assurance of property, employee and labor security and safety is of clear import.

*Id.* at 1170-71.  The court further found that the employee exercised discretion and independent judgment when he provided advice and recommendations on security matters and in organizing training sessions.

In *Copas v. East Bay Municipal Utility Dist.*, 61 F. Supp. 2d 1017 (N.D. Cal. 1999), the plaintiff's duties included investigating accidents, implementing measures to prevent the recurrence of accidents, participating in the presentation of safety training programs and monitoring developments relating to safety programs and regulations, interacting with outside vendors and consultants on health and safety issues, and creating guides for employees.  The court found that the employee had an administrative job and that his duties required the use of discretion and independent judgment:

> His duties involved more than the mere use of acquired skills in applying techniques, procedures and standards.  He was responsible for reviewing the health and safety plans of the various EBMUD departments and divisions, analyzing those plans for compliance with federal and state laws and regulations, and communicating to the managers any deficiencies he found."

1    *Id.* at 1041.

2         In *Dymond v. United States Postal Service*, 670 F.2d 93 (8th Cir 1982), the employees not

3    only conducted investigations, but also developed and implemented new programs, trained new

4    personnel, and maintained security.  *Id.* at 93 n.2.  In finding the administrative exemption

5    applied, the court held that the employees exercised independent judgment and discretion even

6    though they were required to follow procedures in a postal service manual.  *Id.* at 95.

7         In *Ferrell v. Gwinnett County Board of Education*, 481 F. Supp. 2d 1338 (N.D. Ga. 2007),

8    the court held that School Resource Officers ("SROs"), who proactively prevented and responded

9    to school safety and security problems, fell within the administrative exemption.  Each SRO's

10   primary function was providing for the safety and security of the students, employees, and

11   property, and they performed their duties relatively free from supervision.  The court concluded

12   that SROs' primary duty was office or nonmanual work because the "primary value of Plaintiffs

13   to the School System was their ability to provide safety and security to the people and [property]

14   in their clusters, not just their ability to perform conventional law enforcement functions that may

15   traditionally involve manual work."  *Id.* at 1344.  Their work was directly related to management

16   or general business operations, not production, because "the School System is in the business of

17   educating students, not providing law enforcement."  *Id.* at 1347.  They exercised discretion and

18   independent judgment because they rendered advice to their schools on safety and security

19   matters, served as a liaison between the school, local law enforcement agencies, and their

20   community, initiated and directed investigations, and implemented and formulated the school

21   system's safety policies.  *Id.* at 1348.

22        These cases confirm that contrary to Rix's attempt to make sweeping generalizations

23   about exempt vs non-exempt status, it will be necessary for the Court to specifically inquire into

24   the duties of each ISR in order to determine that issue.  This will include making individualized

25   determinations about an ISR's role in conducting security training, preparing or implementing

26   security procedures and programs, providing advice and recommendations on security matters,

27   implementing measures to prevent security violations, monitoring developments relating to

28   security programs and regulations, interacting with government agencies and third parties on

security issues, and analyzing whether security procedures were in compliance with federal regulations.  In assessing all these individualized issues, the Court would also need to assess each ISR's exercise discretion of independent judgment in performing their duties, and whether or not they were subject to "only general supervision" in performing their assignments and tasks.  This inquiry would become even more complex with individuals like Rix, whose duties, and level of supervision, changed repeatedly over the course of his four years of employment in Palmdale.

### C. Rix Fails to Address The Relevant Predominance Factors Under Ninth Circuit Law

In *Vinole* and *Wells Fargo*, the Ninth Circuit addressed the predominance factors that a court should consider in a misclassification class action.  The Ninth Circuit held that "a district court abuses its discretion in relying on an internal uniform exemption policy to the near exclusion of other factors relevant to the predominance inquiry."  *Vinole*, 571 F.3d at 946. Rather, a court must take "into consideration all factors that militate in favor of, or against, class certification."  The focus should be "on whether the employer exercised some level of centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs, and other factors susceptible to common proof."  *Id.*  The Ninth Circuit stressed that "in cases where exempt status depends upon an individualized determination of an employee's work, and where Plaintiffs allege no standard policy governing how employees spend their time, common issues of law and fact may not predominate."  *Id.* at 946-47.

Rix does not address these factors.  Instead, he relies on state law cases that do not address Rule 23, or the relevant factors identified in *Wells Fargo* and *Vinole*.  *See* Mtn 17.  But, even under the state law standard argued by Rix, cases decided subsequent to *Sav-On Drug Stores v. Superior Court*, 34 Cal.4th 319 (2004), have denied class certification in misclassification cases where, as here, the evidence shows the need for individualized inquiries to determine each putative class member's exempt status.  *See Arenas v. El Torito Rests., Inc.*, 183 Cal.App.4th 723, 734-35 (2010); *Keller v. Tuesday Morning, Inc.*, 179 Cal.App.4th 1389, 1399 (2009); *Dunbar v. Albertson's, Inc.*, 141 Cal.App.4th 1422, 1431-32 (2006); *Walsh v. Ikon Office Solutions, Inc*, 148

Cal.App.4th 1440, 1458 (2007).

> 1.   *Rix's Alleged Common Evidence Does Not Eliminate Any Of The Individual Inquiries.*

Rix contends that the policy of classifying ISRs as exempt supports certification.  The Ninth Circuit has rejected this theory as a primary basis for demonstrating predominance.  As explained in *Wells Fargo*:  "Whether such a policy is in place or not, courts must still ask where the individual employees actually spend their time [in a case involving the outside sales exemption]."  571 F.3d at 959.  Therefore, a "uniform exemption policy says little about the main concern in the predominance inquiry:  the balance between individual and common issues."  *Id*.

Rix's motion also asserts that LM's job descriptions constitute "further common proof relevant to adjudicating the common questions that predominate the resolution of the class action."  Mtn 11.  However, to determine whether an employee is exempt under California law, a court "must conduct an individualized analysis of the way each employee actually spends his or her time, and not simply review the employer's job descriptions."  *Vinole*, 571 F.3rd at 937.  Further, as discussed above Rix's primary duty theory, as well as Rix's testimony, are attempts to disavow the clearly exempt duties set forth in the description, such as developing and administering security programs and procedures, establishing procedures for handling, storing and keeping records, performing work under general direction, representing LM as a prime contact on contracts or projects, and developing solutions to a variety of complex problems.  Thus, even if the job descriptions constituted common proof of job duties, Rix's own theories would necessitate individual inquiries as to each and every ISR to determine if they were performing the job description duties, or the duties Rix claims he and others performed.  *See Mike v. Safeco Ins. Co.*, 223 F.R.D. 50, 53-54 (D. Conn. 2004) (denying certification because determining whether class members actually performed job description duties is an individualized question); *see also Trinh v. JP Morgan Chase & Co.*, 2008 WL 1860161 (S.D. Cal. Apr. 22, 2008) (denying conditional certification under the FLSA where the question of whether class members are exempt "necessarily involves a fact-by-fact inquiry into the circumstances of each

1   employee to see if he or she falls within an . . . exemption").[12]

2   Rix also claims that "the primary tasks of the security reps are defined by comprehensive

3   corporate procedures and policies."  Mtn 13.  Rix has presented no such policies or procedures

4   into evidence.  Rather, he simply vaguely refers to the NISPOM, and other government manuals,

5   and then relies on his own self-serving testimony that all ISRs had to adhere to the NISPOM for

6   guidance on how to handle classified and unclassified documents.  Interestingly, when Rix was

7   initially questioned about the NISPOM at his deposition, he could not recall *anything* in the

8   NISPOM that he referred to during his employment.  Ex. 7C (Rix 61:22-67:2).[13]

9   Further, the NISPOM and other guidelines (which vary from program to program) only

10   set forth the basic general guidelines, and can be subject to differing interpretations.  In fact, one

11   of LM's witnesses pointed out several examples of specific guidelines in NISPOM and explained

12   how the guidelines required the use of judgment to apply them to specific situations.  Ex 7A

13   (Aviles 68:2-70:23).  LM's declarants also state how they interpret and apply the guidelines in the

14   course of their duties, how they obtain waivers from the guidelines, and how they develop

15   security programs and procedures implementing not only the government guidelines but also the

16   project specific requirements.  Ex 1 (Albin Decl. ¶ 5); Ex 4 (Riggs Decl. ¶ 6).

17   Significantly, "where government regulations or internal employer policies and

18   procedures simply *channel* the exercise of discretion and judgment and discretion as opposed to

19   *eliminating* it entirely or otherwise constraining it to a degree where any discretion is largely

20   inconsequential," employees can exercise sufficient discretion and judgment under California law

21   to qualify as exempt.  *Taylor*, 2010 WL 4983586 at *15 (emphasis in original); *see also Kennedy*

22   *v. Commonwealth Edison Co.*, 410 F.3d 365, 374-75 (7th Cir. 2005) ("while the plaintiff's

23   discretion may be channeled by the regulations that apply to [nuclear power plants], that does not

---

[12]  Plaintiff also wrongly implies that job descriptions are used by LM to fully describe the ISR job responsibilities.  Although the job descriptions are used as the starting point in the preparation of job requisitions, the manager also sets forth specific criteria for each ISR position in the hiring process.  Ex 7H (Young 107:16-108:13); Ex 7A (Aviles 63:14-65:12).

[13]  The vague and argumentative (and identically worded) assertions by three declarants that the NISPOM "is the Bible, it governs everything," are not evidence that all ISRs performed the same duties in the same way.  Indeed, the duties that Plaintiff's declarants describe in connection with the NISPOM are duties that other declarants state they did not perform or were not their primary tasks.  *See generally,* Ex 4 (Riggs Dec); Ex 2 (Barragan Dec).

1  mean ComEd Employees do not exercise independent judgment.")  Thus, the NISPOM and other

2  procedures, including program specific procedures, raise yet another individualized issue the

3  Court would have to determine; *i.e.*, whether a particular ISR (as Rix claims) was unable to

4  exercise discretion and judgment due to the policies, or (as LM's declarants state) ISRs had their

5  discretion *channeled* by the NISPOM and other procedures.  Whether a particular ISR was

6  actually writing procedures for others to follow is yet another individualized inquiry that would

7  need to be made.

8       In *Wells Fargo* and *Vinole*, the Ninth Circuit made clear that the mere existence of

9  corporate policies does not support certification in a misclassification case.  Corporate policies

10 will not support certification unless they demonstrate a "level of centralized control" such that

11 they "govern[] how employees spend their time," *Vinole*, 571 F.3d at 946-47, and "reflect the

12 realities of the workplace," *Wells Fargo*, 571 F.3d at 958-59.  Rix's mere references to the

13 NISPOM, etc., or to DSS training, clearly do not meet this standard.[14]

14      Significantly, in recent decisions applying *Vinole* and *Wells Fargo*, courts denied class

15 certification or granted decertification where the plaintiff, as here, relied on general references to

16 common policies, job descriptions, and training.  In *Weigele v. FedEx*, 2010 WL 1337031*7-*8,

17 the court held that the defendant's common processes and training did not support a finding of

18 predominance because they would "provide no help to the Court in determining the actual work

19 mix performed by the Plaintiffs."  Similarly, in *Whiteway v. FedEx Kinko's Office & Print Servs.,*

20 *Inc.*, Case No. C 05-2320 SBA (N.D. Cal. Oct. 2, 2009), the court granted the defendant's motion

21 for decertification of the misclassification claim as the plaintiff had "not pointed to any policy or

22 common practice demonstrating that these employees as a class are required or expected to

23 allocate the majority of their time to non-exempt tasks."  In *Wells Fargo II*, on remand, the

24 district court found that even though there were common job descriptions, uniform training,

25 standardized evaluation standards, and similar compensation plans, these common issues would

26 
27 
28 

---

[14] Contrary to Rix's contention, ISRs do not take mandatory uniform training.  The testimony cited by Rix is a general description of the type of training provided by the DSS that ISRs can choose to take, but ISRs are not required to take any DSS or other training.  Ex 5 (Stephens Dec ¶ 3; Ex 3 (Nye Dec ¶ 6); Ex 2 (Barrgan Dec ¶ 5); Ex 1 (Albin Dec ¶ 3) Ex 4 (Riggs Dec ¶5).

1    not eliminate the need for the court to conduct fact-intensive inquiries into how each class

2    member spent their working day.  The court found that these individual inquiries "would

3    inevitably consume the majority of a trial, and overwhelm the adjudication of common issues."

4    2010 WL 174329, *7 (N.D. Cal. Jan. 13, 2010).

5              2.    *Rix's Certification Authority Is Either No Longer Good Law Or Readily
                    Distinguishable.*

6

7    Consistent with *Rix's* failure address the requirements of *Wells Fargo* and *Vinole*, the

8    Motion mainly cites cases that predate those decisions.  Mtn 1 n. 2, 19.  Indeed, three of the cases

9    subsequently rejected class certification, based on the standards set forth in *Vinole* and *Wells

10   Fargo.*[15]  All of the pre-*Vinole* and *Wells Fargo* decisions that Rix cites placed near-exclusive

11   reliance on the employer's common classification of a position as exempt, which the Ninth

12   Circuit subsequently ruled was an abuse of discretion.[16]  Other cases are clearly distinguishable.

13   In *Tierno v. Rite Aid Corp.*, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006), every store manager

14   class member was required to comply with a checklist prepared by the company that set forth a

15   list of items that needed to be completed every day and the employer conceded that a single set of

16   sixteen specified tasks was applicable to all store managers.  In *Brady v. Deloitte and Touche*

17   *LLP,* 2010 WL 1200045 (N.D.Cal March 23, 2010), the plaintiffs pointed to specific statutes and

18   company policies regulating unlicensed accountants – including national training to ensure they

19   all performed audits the same way – that they alleged <u>restricted</u> the discretion of class members

20   and caused them to not work under only general supervision.  There is no evidence here of such

21   statutory restrictions, global training or common duties uniformly performed by all putative class

22   members.[17]

23   [15] *See Wong v. HSBC Mortgage*, 2010 WL 3833952 (N.D.Cal. Sept. 29, 2010); *Wong v. HSBC Mortgage,* 2010 WL
     3833952 (N.D. Cal. Sept. 29, 2010)*; Weigele v. Fed Ex*, 2010 WL 1337031 (S.D. Cal. Apr. 5, 2010)*; Whiteway v.
24   FedEx Kinko's Office & Print Servs., Inc.*, Case No. C05-2320 SBA (N.D. Cal. Oct. 2, 2009).
     [16] *See Heffelfinger v. EDS Corp.*, 2008 WL 892989 (C.D. Cal. Jan. 7, 2008); *Alba v. Papa John's USA, Inc.*, 2007
25   WL 953849 (C.D. Cal. 2007); *Wang v. Chinese Daily News*, 231 F.R.D. 602 (C.D. Cal. 2005), aff'd. on other
     grounds, __ F.3d __ (9th Cir. 2010).
26   [17] Other cases cited by Plaintiff involved the lenient "first stage" certification standard under the FLSA, not Rule 23
     (*e.g., Lewis v. Wells Fargo & Co.*, 669 F.Supp.2d 1124 (N.D. Cal. 2009) ("the requisite showing of similarity of
27   claims under the FLSA is considerably less stringent than the requisite showing under Rule 23"), were decided in an
     uncontested motion for approval of a settlement where it was stipulated that the class had the same work duties and
     experiences, *see Louie v. Kaiser Foundation Health Plan, Inc.*, 2008 WL 4473183 (S.D. Cal. October 6, 2008), or did
28   not even involve misclassification claims, *see Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625 (S.D. Cal. 2010);

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

### D.     Individual Issues Predominate As To Rix's Meal and Rest Break Claims

Rix submits <u>no</u> evidence to substantiate his burden that the meal and rest break claims should be certified.  Certification of those claims should be denied on that basis alone.  Rix cannot avoid his evidentiary burden claim by wrongly asserting that "derivative claims" are routinely certified with misclassification claims.  Mtn 1 fn 3.  The cases Rix cites do not support his assertion.  *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625 (S.D. Cal. 2010) and *Ortega v. J.B. Hunt Transp., Inc.,* 258 F.R.D 361 (C.D. Cal. 2009), had no misclassification claims, and *Brady v. DeLoitte & Touche* did not have meal and rest break claims.  The decision in *Campbell v. Pricewaterhousecooper*, 253 F.R.D. 586 (E.D. Cal. 2008), to disregard the evidence that these claims present individualized issues is erroneous and should not be followed.

Rix's meal and rest break claims are not entirely derivative of his misclassification claim.  Even if Rix or other ISRs were found to be non-exempt, liability would depend on whether ISRs were was "provided" a meal break or "authorized and permitted" to take a rest break – an individualized inquiry as to each employee and each break.  *See Salazar v. Avis Budget Group, Inc.*, 251 F.R.D. 529, 534 (S.D. Cal. 2008) ("plaintiffs must show defendants forced plaintiffs to forego missed meal periods") (emphasis in original).  Under this standard, courts have held that meal and rest period claims are usually not appropriate for class treatment because individual inquiries predominate.  *See, e.g. Blackwell v. SkyWest Airlines, Inc.*, 245 F.R.D. 453, 467 (S.D. Cal. 2007); *Brown v. Federal Express Corp.*, 2008 WL 906517 (C.D. Cal. 2008); *Hernandez v. Chipotle Mexican Grill, Inc.*, 189 Cal. App. 4th 751 (2010).  Here, not only has Rix failed to present any common proof that meal or rest breaks were not provided, the evidence shows that they were provided. Ex 4 (Riggs Dec ¶ 13); Ex 2 (Barragan Dec ¶ 9); Ex 5 (Stephens Dec ¶ 9); Ex 3 (Nye Dec ¶ 7).

## VI.     RIX FAILS TO ESTABLISH THAT A CLASS ACTION IS THE SUPERIOR METHOD FOR ADJUDICATING THE CLAIMS

Pursuant to Rule 23(b)(3), Rix must also establish that a class action is superior to other methods of adjudication.  Rule 23(b)(3)(D) requires a court to consider "the likely difficulties in

---

*Ortega v. J.B. Hunt Transp., Inc.*, 258 F.R.D. 361 (C.D. Cal. 2009); *Perez v. Safety Kleen Systems, Inc.*, 253 F.R.D. 508 (N.D. Cal. 2008); *Kurihara v. Best Buy*, 2007 WL 2501698 (N.D. Cal. August 30, 2007).

1   managing a class action" when deciding whether class certification is proper.  "If each class

2   member has to litigate numerous and substantial separate issues to establish his or her right to

3   recover individually, a class action is not 'superior.'"  *Zinser*, 253 F.3d at 1192.  In *Weigele*, the

4   court agreed that "given all of the individual issues that must be litigated in this matter, trial

5   administration would be overwhelming."  *Weigele*, 2010 WL 1337031 *10.  The same is true

6   here.

7        The party seeking class certification bears the burden of demonstrating "a suitable and

8   realistic plan for trial of the class claims."  *Zinser*, 253 F.3d at 1198.  In *Wells Fargo*, the Ninth

9   Circuit rejected the notion that "innovative procedural tools" could render a misclassification trial

10   manageable "in light of our determination that Plaintiffs' claims require a fact-intensive,

11   individual analysis of each employee's exempt status."  571 F.3d at 947.  *See also Mendoza v.*

12   *Home Depot, U.S.A. Inc.*, 2010 WL 424679 *10 (C.D. Cal. Jan. 21, 2010) (finding class action

13   not superior "particularly in light of the fact that Home Depot should be entitled to raise

14   affirmative defenses to individual plaintiffs' claims").

15        A class action is not superior if it is unlikely a jury will be able to reasonably and

16   rationally rule on all the issues.  *See Weigele*, 2010 WL 1337031 *11 ("Moreover, the Court is

17   unclear how a jury will be able to sort out the issues placed before it.  It appears that they will

18   need to determine whether each testifying witness was or was not exempt and determine to what

19   extent that witness was not provided with mandated overtime, meal, and rest breaks.  They will

20   then need to extrapolate from all of the testifying witnesses to the entire class.  But it is unclear

21   which tools they will have to perform that extrapolation.  At worst it appears that they would be

22   left to guess.  This is too amorphous to expect a reasonable and rational result from any jury.").

23        Here, Rix does not demonstrate "a suitable and realistic plan for trial of the class claims"

24   through any type of common proof.  Because resolution of Rix's claims would require substantial

25   individualized fact-finding, any trial would be consumed by inquiries into each ISR's specific

26   duties, making a class trial no better than a series of individual actions.

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

1

**VII.    <u>CONCLUSION</u>**

2          For the foregoing reasons, LM respectfully requests that the Court deny Rix's Motion for

3   Class Certification.

4   Dated:  December 20, 2010                    MORGAN, LEWIS & BOCKIUS LLP

5

6                                               By _____
                                                   John S. Battenfeld
7                                                  Attorneys for Defendant
                                                   LOCKHEED MARTIN CORPORATION
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

*Thomas Rix v. Lockheed Martin Corporation*
*USDC Case No. 3:09-cv-2063 MMA-NLS*

I am a resident of the State of California, County of Los Angeles; I am over the age of eighteen years and not a party to the within action; my business address is 300 South Grand Avenue, 22nd Floor, Los Angeles, California  90071.

On December 20, 2010, I served on the interested parties in this action the within document(s) entitled:

**DEFENDANT LOCKHEED MARTIN CORPORATION'S ANSWER
TO FIRST AMENDED COMPLAINT**

[  ]   **BY FAX:** by transmitting via electronic facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.; I also caused the fax machine to print such record(s) of the transmission.

[ **X** ]   **BY MAIL:** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[  ]   **BY OVERNIGHT MAIL:  By FEDERAL EXPRESS**, following ordinary business practices for collection and processing of correspondence with said overnight mail service, and said envelope(s) will be deposited with said overnight mail service on said date in the ordinary course of business.

[  ]   **BY PERSONAL SERVICE:**  I delivered to an authorized courier or driver authorized by _____. to receive documents to be delivered on the same date.  A proof of service signed by the authorized courier will be filed with the court upon request.

[  ]   **BY ELECTRONIC SERVICE**:  the parties listed below were served electronically with the document(s) listed above by e-mailed PDF files on December 20, 2010.  The transmission was reported as complete and without error.  My electronic notification address is 300 South Grand Avenue, 22nd Floor, Los Angeles, CA, 90071.  My e-mail address is cfrutos@morganlewis.com.

[ **X** ]   **BY E-FILE**:  I caused such documents to be transmitted by e-file with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/22091042.7                                    1                          Case No. 09-cv-2063-MMA-NLS

PROOF OF SERVICE

| | |
|---|---|
| **Norman B. Blumenthal**<br>**Aparajit Bhowmik**<br>Blumenthal, Nordrehaug & Bhowmik<br>2255 Calle Clara<br>La Jolla , CA 92037<br>Tel:  858-551-1223<br>Fax:  858-551-1232<br>Email: norm@bamlawlj.com<br>Email:  aj@bamlawlj.com<br><br>**Served by E-File** | *Attorneys for Plaintiff* |
| **Walter Haines**<br>United Employees Law Group<br>65 Pine Ave, #312<br>Long Beach, CA  90802<br>Tel:  562-256-1047<br>Fax:  562-256-1006<br>Email: admin@uelglaw.com<br><br>**Served by Electronic Service** | |

[   ]  **STATE:**  I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.

[ **X** ]  **FEDERAL:**  I declare that I am employed in the office of a member of the Bar of this Court at whose direction this service was made.

Executed on December 20, 2010, at Los Angeles, California.

_____
CARIDAD F. FRUTOS

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES